RITA W. GRUBER, Chief Judge
This is an appeal from a jury trial on whether Davis Life Care Center (Davis), a long-term-care facility, was entitled to charitable immunity. Johnny Newborn died on December 6, 2011, while residing at Davis. After Newborn's death, Gracie Neal sued Davis in her capacity as personal representative of his estate and on behalf of his wrongful-death beneficiaries. Davis responded by claiming it was entitled to charitable immunity, and the circuit *487 court granted summary judgment to Davis on this basis. Neal appealed, and our court reversed and remanded. See Neal v. Davis Nursing Ass'n , 2015 Ark. App. 478, 470 S.W.3d 281. On remand, the circuit court held a jury trial on whether Davis was entitled to charitable immunity, and the jury concluded that it was not. Davis appeals arguing that (1) a jury trial was improperly held; (2) the jury was improperly instructed; and (3) substantial evidence did not support the jury's verdict. We affirm.
I. Background
In 2013, Neal sued Davis for negligence, medical malpractice, breach of the admission agreement, violations of the Long-Term Care Facility Residents' Rights Act, and breach of the provider agreement. Davis answered Neal's complaint and raised the affirmative defense of charitable immunity. Thereafter, the circuit court granted summary judgment to Davis based on charitable immunity, concluding that Neal failed to refute evidence that Davis is a nonprofit organization created for charitable purposes.
Neal timely appealed the order granting summary judgment to our court. On appeal, we engaged in a review of the factors our supreme court adopted in Masterson v. Stambuck , 321 Ark. 391, 902 S.W.2d 803 (1995), to analyze whether a corporation is entitled to charitable immunity. These factors, which are illustrative and not exhaustive, include:
(1) whether the organization's charter limits it to charitable or eleemosynary purposes; (2) whether the organization's charter contains a "not-for-profit" limitation; (3) whether the organization's goal is to break even; (4) whether the organization earned a profit; (5) whether any profit or surplus must be used for charitable or eleemosynary purposes; (6) whether the organization depends on contributions and donations for its existence; (7) whether the organization provides its services free of charge to those unable to pay; and (8) whether the directors and officers receive compensation.
Id. at 401, 902 S.W.2d at 809. With these standards in mind, our court determined that questions of fact susceptible to different interpretations by reasonable persons precluded summary judgment. Specifically, we concluded that, considered together, Davis's relationship to Davis Life Care Services, its failure to ever earn a profit, its questionable characterization of free care and lack of charitable donations, and its intentions as they relate to profitability could reasonably result in the conclusion that Davis was not truly operating as a charity. Neal , 2015 Ark. App. 478, at 8, 470 S.W.3d at 285-86. Accordingly, we reversed and remanded the case to the circuit court for further proceedings. Neal, supra.
On remand, Davis moved to bifurcate the proceedings, with the circuit court first resolving whether Davis was entitled to charitable immunity and then proceeding to the liability and damages phase of trial in the event it was determined that Davis was not immune from suit. In the motion, Davis maintained that charitable immunity is properly decided as a matter of law by the court, rather than a jury. Neal opposed both the bifurcation of the trial and the submission of the immunity question to the court.[1] Ultimately, the circuit court granted Davis's request for bifurcation but ordered *488 that the question of Davis's immunity would be submitted to a jury.
On November 15-17, 2016, a jury trial was held on the issue of whether Davis was entitled to charitable immunity. At the conclusion of the evidence, the circuit court instructed the jury on the applicable law. The primary instruction given was based on the Masterson factors. Significantly, the circuit court declined to give five instructions proffered by Davis that included language gleaned from prior charitable-immunity caselaw. The case was submitted to the jury on a single interrogatory: "Do you find from a preponderance of the evidence that Davis is entitled to the affirmative defense of charitable immunity?"[2] The jury returned a verdict with an answer of "No."
Thereafter, the circuit court entered a judgment memorializing the jury's verdict. Following the entry of the judgment, Davis moved for a new trial, which was deemed denied.
Davis timely appealed the circuit court's judgment and its denial of the motion for new trial and raises three arguments for reversal. Most significantly, Davis argues the circuit court erred by holding a jury trial on the issue of charitable immunity. Davis also seeks reversal based on the circuit court's refusal to give five proffered jury instructions. Finally, Davis contends the jury's verdict was not supported by substantial evidence.
II. The Right to a Jury Trial
Davis argues that entitlement to charitable immunity is a question of law, which must be decided by the court rather than a jury, and that accordingly, the circuit court erred by submitting this question to a jury. We disagree. Although the question of whether charitable immunity may be decided by a jury has not been squarely addressed in Arkansas, our review leads us to conclude that it may.
We begin our analysis by acknowledging that article 2, section 7 of the Arkansas Constitution provides in relevant part, that "the right of trial by jury shall remain inviolate, and shall extend to all cases at law." This is a fundamental right that extends to the trial of issues of fact in civil and criminal causes. Craven v. Fulton Sanitation Serv., Inc. , 361 Ark. 390, 395, 206 S.W.3d 842, 845 (2005).
Furthermore, our supreme court has contemplated that factual issues involving charitable immunity may be resolved by a jury. In Crossett Health Center v. Croswell , our supreme court held that Crossett Health Center was not entitled to charitable immunity and stated that "there are factors sufficient for the jury to find that [Crossett Health Center] was not a trust involving dedication of its property to the public." 221 Ark. 874, 883, 256 S.W.2d 548, 552 (1953).
Our supreme court's opinion in Anglin v. Johnson Regional Medical Center is also instructive and, indeed, more persuasive than Croswell . 375 Ark. 10, 289 S.W.3d 28 (2008). In Anglin , the supreme court affirmed the grant of summary judgment to a hospital based on charitable immunity; however, the court stated that "where there are disputed facts concerning an organization's charitable status, those facts should be presented to the jury." 375 Ark. at 21, 289 S.W.3d at 35.
Finally, although only persuasive authority, we acknowledge that Justice Robert *489 Brown twice dissented from majority opinions wherein the supreme court held that certain hospitals were entitled to charitable immunity. See Anglin , supra ; George v. Jefferson Hosp. Ass'n, Inc. , 337 Ark. 206, 987 S.W.2d 710 (1999). In both Anglin and George , our supreme court affirmed a circuit court's order granting summary judgment based on charitable immunity. In his dissents, Justice Brown maintained that, based on his understanding of Croswell , it was clear that, when there are factual issues involved in a charitable-immunity defense, this court has held that the matter is for the jury to resolve. Anglin , 375 Ark. at 23, 289 S.W.3d at 37 (Brown, J., dissenting); George , 337 Ark. at 218, 987 S.W.2d at 716 (Brown, J., dissenting). It is noteworthy that the majority opinion in Anglin also recognizes that disputed facts regarding an organization's charitable status should be presented to a jury and that the majority opinion in George does not engage in any analysis of whether disputed facts should be presented to a jury.
The language in the caselaw we discuss comports with how our court has handled the issue of charitable immunity. Our recent cases indicate that the question of charitable immunity often involves facts on which reasonable persons could reach different conclusions. Specifically, our court has held that "if the evidence presented creates a genuine issue of material fact, the matter cannot be determined as a matter of law." Progressive Eldercare Services-Saline, Inc. v. Cauffiel , 2016 Ark. App. 523, at 10, 508 S.W.3d 59, 66.
In the previous appeal of this matter, we noted several issues of fact and reversed and remanded the case to the circuit court for further proceedings, and it stands to reason that Neal has a right to have those issues of fact decided by a jury. Based on article 2, section 7 of our constitution and our caselaw, we affirm the circuit court's decision to hold a jury trial on Davis's entitlement to charitable immunity.
III. The Proffered Jury Instructions
Davis also argues the circuit court abused its discretion by refusing to give five proffered jury instructions. Before we undertake our analysis of this issue, we recognize that this area of the law is unsettled, and that, accordingly, there are no model jury instructions or standards to guide a circuit court's instruction of a jury on charitable immunity.
Still, our general law pertaining to jury instructions is well settled. A party is entitled to a jury instruction when it is a correct statement of the law, and there is some basis in the evidence to support giving the instruction. S. Farm Bureau Cas. Ins. Co. v. Daggett , 354 Ark. 112, 118 S.W.3d 525 (2003). Nevertheless, our court will not reverse a circuit court's refusal to give a proffered instruction unless there was an abuse of discretion. Id. It is not error for a circuit court to refuse a proffered instruction when the stated matter is correctly covered by other instructions. Id.
In this case, the operative instruction given to the jury was based on the Masterson factors. The court instructed:
Davis Nursing Associates, doing business as Davis Life Care Center, contends that it is entitled to the affirmative defense of charitable immunity and has the burden of proving this contention. Arkansas law has adopted eight factors to review when deciding whether a corporation is entitled to charitable immunity. These factors include: (1) whether the organization's charter limits it to charitable purposes; (2) whether the organization's charter contains a "not-for-profit" limitation; (3) whether the organization's goal is to break even; (4) whether the organization earned a profit; (5)
*490 whether any profit or surplus must be used for charitable purposes; (6) whether the organization depends on contributions or donations for its existence; (7) whether the organization provides its services free of charge to those unable to pay; and (8) whether the directors and officers receive compensation. These factors are illustrative not exhaustive, and no one factor is dispositive of charitable status.
See Masterson , 321 Ark. 391, 902 S.W.2d 803. Davis contends the use of this instruction, without further explanation, misled the jury and was inadequate.
In deciding whether the circuit court abused its discretion, two important considerations color our analysis. First, in declining to give the proffered instructions, the circuit court mentioned that the rejected instructions could be incorporated into Davis's closing argument. Additionally, it appears that Davis merely cherry-picked language from appellate caselaw on charitable immunity that supported its argument. Although we recognize that each proffered instruction is based on some evidence presented at trial and gleaned from our caselaw, the usage of these proffered instructions is problematic because they serve to emphasize some Masterson factors to the exclusion of others. Moreover, the proffered instructions arise out of prior applications of the Masterson factors to particular facts. We are reminded that a charitable-immunity determination is based on "the totality of the relevant facts and circumstances," thus these instructions are not particularly helpful in evaluating the facts of this case. George , 337 Ark. at 206, 987 S.W.2d at 714. Accordingly, we hold that the circuit court did not abuse its discretion in refusing Davis's five proffered instructions.
IV. Substantial Evidence to Support the Verdict
Finally, we consider Davis's argument that our court must reverse because substantial evidence did not support the jury's verdict. Substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. Koch v. Northport Health Servs. of Ark., LLC , 361 Ark. 192, 205 S.W.3d 754, 763 (2005). In determining the existence of substantial evidence, we must view the evidence in the light most favorable to the appellee. Ray v. Green , 310 Ark. 571, 839 S.W.2d 515 (1992). Evidence favorable to the appellee is given the benefit of all reasonable inferences permissible under the proof. Id.
In evaluating whether substantial evidence supports the jury's verdict, we must revisit the Masterson factors, namely:
(1) whether the organization's charter limits it to charitable or eleemosynary purposes; (2) whether the organization's charter contains a "not-for-profit" limitation; (3) whether the organization's goal is to break even; (4) whether the organization earned a profit; (5) whether any profit or surplus must be used for charitable or eleemosynary purposes; (6) whether the organization depends on contributions and donations for its existence; (7) whether the organization provides its services free of charge to those unable to pay; and (8) whether the directors and officers receive compensation.
Masterson , 321 Ark. at 401, 902 S.W.2d at 809.
A. Davis's Charter
Davis's charter contains a not-for-profit limitation and limits Davis to charitable purposes.
*491 B. Davis's Profitability
The next three Masterson factors pertain to Davis's profitability. They are whether Davis's goal was to break even, whether it earned a profit, and whether any profits were used for charitable purposes.
Here, Davis highlights testimony elicited from its director Brian Miller and its CPA Jay Hickey that its goal was to merely break even. Davis further emphasizes that the evidence demonstrates that it often failed to meet its goal and consistently operated at a loss. The testimony demonstrated that because of its operating deficit, Davis often delays payments on its financial obligations and takes out loans to make payroll and pay urgent bills. Davis also stresses that John Langham, a CPA who testified on behalf of Neal, admitted that Davis's financial records were accurate. Thus, Davis claims this case is distinguishable from the recent line of cases in which evidence clearly indicated manipulation of financial records to appear unprofitable. See generally Watkins v. Ark. Elder Outreach of Little Rock, Inc. , 2012 Ark. App. 301, 420 S.W.3d 477. Finally, Davis explains that any profit has been put back into the facility through actions such as the repayment of debt and in improving the facility.
Neal responds by emphasizing evidence tending to show profitability. First, John Langham observed that Davis's mission is to operate a nursing facility for the benefit of residents, most of whom are elderly, which is the same mission of a for-profit nursing home. Additionally, Langham compared Davis's gross revenue to that of other nursing homes in Arkansas and found that it ranked in the middle; he testified that he would expect a true non-profit to rank lower. Finally, Neal reminds our court of language from the first appeal in this case in which our court wrote, "[A] question remains as to whether reinvesting profits is sufficient" to satisfy the factor relating to whether Davis uses profit for charitable purposes "especially if the evidence, taken as a whole, challenges the true nature of the facility." Neal , 2015 Ark. App. 478, at 5-6, 470 S.W.3d at 284.
C. Davis's Funding and Dependence on Donations
The evidence reflected that Davis receives minimal cash donations. Specifically, Jay Hickey testified that in five years, Davis received $1645 in monetary donations compared to nearly $40 million in gross revenues. John Langham explained that non-profit organizations typically receive one-third of their revenue from public support or donations. Nevertheless, evidence was presented that Davis received numerous noncash donations and had a $6 million debt forgiven by Jefferson Regional Medical Center.
D. Free Services
With respect to free services, the evidence indicated that Davis admits patients with the presumption that they will pay their bills. Although the evidence showed that no one has been discharged for nonpayment, Davis's admissions agreement contemplates payment and gives Davis the right to discharge a resident from the facility "upon non-payment of the Resident's financial obligations to the Facility." The evidence also established that Neal was required to sign a personal guarantee for all obligations of Mr. Newborn pursuant to this agreement. Moreover, admission coordinator Evelyn Horton and administrator Kathy Cash testified that one factor considered for admission is the ability to pay. Horton further stated that, to her knowledge, no one was admitted who Davis did not think could pay, and Cash stated that she could think of instances *492 where ability to pay was a factor in admissions denial.
The financial documents illustrate that Davis provides some unreimbursed care, and Davis contends that unreimbursed care is free care. See Jackson v. Sparks Reg'l Med. Ctr. , 375 Ark. 533, 540, 294 S.W.3d 1, 5 (2009). But as our court mentioned in the first appeal, "Davis failed to establish that forgiving uncollectable debt is equivalent to providing free services." Neal , 2015 Ark. App. 478, at 6, 470 S.W.3d at 284-85. Moreover, the jury heard evidence that the amount of debt forgiven by those who do not or cannot pay is minuscule in comparison to Davis's overall revenue.
E. Compensation of Directors and Officers
Here, the evidence indicated that members of Davis's board did not receive compensation-their only incentive for involvement was free breakfast at meetings. Each board member who testified stated that all meetings took place at the facility, but later Jay Hickey admitted that some meetings were held at the Pine Bluff Country Club.
With regard to compensation of its directors, the evidence showed that Davis compensated its director. Former executive director Joe Ratliff was paid $178,466 in 2011-2012. Additionally, Ratliff's membership dues to the Pine Bluff Country Club were paid by Davis, and he sometimes entertained business associates there. The current executive director Brian Miller is paid a $145,000 salary with $6,000 for travel expenses.
F. A Review of the Evidence
We are reminded that our court reviews the jury's verdict for whether substantial evidence supported it, reviewing the evidence in the light most favorable to Neal. We acknowledge that Davis often compares the facts in this case to those in which Arkansas appellate courts have determined that an entity was charitably immune from suit to bolster its argument for reversal. Davis's comparison is not particularly persuasive because our review is conducted based on the "the totality of the relevant facts and circumstances." George , 337 Ark. at 214, 987 S.W.2d at 714.
We hold that substantial evidence supports the jury's verdict. In reaching this conclusion, we are particularly persuaded by John Langham's testimony that Davis's gross revenue places it in the middle of all Arkansas nursing homes in terms of profitability. It is also significant that Davis receives minimal cash donations. Finally, the most compelling evidence is based on the free-care factor. There is ample evidence that Davis admits patients with the presumption that they will pay. Furthermore, the amount of free care-which is only unreimbursed care-provided by Davis is minimal in comparison to Davis's overall revenue.
Affirmed.
Abramson, Virden, Hixson, and Brown, JJ., agree.
Harrison, J., dissents.
The main question the jury was asked to decide, after the parties presented their evidence during a bifurcated three-day trial, was whether Davis was charitably immune. While deliberating its decision, the jury sent three notes to the circuit court:
• "I have a question about Charitable Immunity."
• "Are payments from Medicaid and Medicare retro-active after admission?"
• "What is the definition of Charitable Immunity?"
*493 The court answered the jury, in sum and substance: You have the testimony, exhibits, and the instructions.
The jury's confusion cannot be totally surprising because it was not given some important legal principles that inform a charitable-immunity decision. That there are no model jury instructions in this area means that all instructions must come directly from the caselaw. All Davis sought to do here was to submit, based on the evidence produced at trial, a set of jury instructions that fairly stated the meandering contours of charitable immunity. Davis tried to give the jury the same principles of law that any circuit court would itself consider if tasked to decide the issue. I cannot see the harm in the attempt.
For example, the first instruction Davis proffered, which the circuit court rejected, stated:
Under Arkansas law, it is permissible for an entity to remain a charitable entity and own or control for-profit businesses. If you find by a preponderance of the evidence that Davis Life Care Center owns or controls a for-profit business, that fact alone does not negate Davis Life Care Center's claim of being a charitable entity.
The instruction recites a legal proposition directly from George v. Jefferson Hospital Ass'n, Inc. , 337 Ark. 206, 214, 987 S.W.2d 710, 714 (1999). The majority concedes as much then collectively makes a cursory conclusion that none of Davis's five proffered instructions are "particularly helpful." But the pivotal legal analysis is (1) whether there was some evidence to support a proffered instruction, and (2) whether the instruction accurately states the law. Coca-Cola Bottling Co. v. Priddy , 328 Ark. 666, 945 S.W.2d 355 (1997). On instruction No. 1, the answer to the two critical questions is yes.
The majority is concerned that Davis's proffered instructions "serve to emphasize some Masterson factors to the exclusion of others." But how such a thing happened is left unexplained; we are simply not told why each proffered instruction overemphasized (or underemphasized) this Masterson factor or that one, or some unidentified combination of the eight factors.
Staying with instruction No. 1 as a concrete example, none of the Masterson factors addressed whether an entity seeking immunity could also own a for-profit business. The jury, however, was permitted to hear evidence that Davis had an ownership interest in two for-profit assisted-living facilities that it managed. The jury should have also been allowed to know, as part of the complex analysis a charitable-immunity question presents, that a party who owns a for-profit business is not necessarily precluded from receiving charitable immunity.
Moving down the list, Davis's proffered instructions Nos. 2 and 3 would have explained to the jury that a charitable entity may charge for medical services-and that a modern medical facility can still be a charitable entity although it receives most, if not all, funding from Medicare, Medicaid, and insurance companies. Whether one agrees with the current state of the law or not, the core point is that these two instructions touch at least one of the questions the jury asked the circuit court, and the evidence at trial about the cost of care and who paid for it. Again, the governing rule is that a party is entitled to an instruction when it is a correct statement of the law and there is some basis in the evidence for it. ProAssurance Indem. Co. v. Metheny , 2012 Ark. 461, at 11, 425 S.W.3d 689, 696. The test was met again regarding Davis's proffered instructions Nos. 2 and 3. In fact, the majority opinion does not explicitly state why these instructions failed the relevant legal test, especially *494 considering the parties are in an area that lacks even one model instruction on point.
Although I have only briefly highlighted three proffered instructions, all five proffered instructions were accurate statements of Arkansas's common-law doctrine of charitable immunity, grounded in some evidence, and calculated to more accurately inform the jury's decision. The instructions should have been given to the jury in this case, and not doing so was an abuse of discretion.
? ? ?
The judgment denying Davis charitable immunity was the product of an inadequate jury-instruction process. Consequently, I would at a minimum reverse the judgment and remand for a new trial on the immunity issue. How many instructions and in which combinations would adequately instruct a jury on the law going forward is beyond this dissent's scope.
That said, the instruction process, now that the majority has expressly allowed juries to decide the ultimate question of whether a party is charitably immune, will be another lingering point of disagreement and costly litigation for all parties in this area of the law. And it is another reason why I am increasingly persuaded that courts, not juries, should decide the immunity question while using a fair, clearly defined, and more efficient process. See George , 337 Ark. 206, 987 S.W.2d 710 (charitable immunity is a question of law reviewed de novo on summary judgment); see also White River Health Sys., Inc. v. Long , 2018 Ark. App. 284, 551 S.W.3d 389 (Harrison, J., dissenting); Progressive Eldercare Servs.-Saline, Inc. v. Cauffiel , 2016 Ark. App. 523, 508 S.W.3d 59 (Harrison, J., concurring).

We note that, frequently during oral arguments to the circuit court, counsel for Neal represented that our court held that a jury trial was proper to determine charitable immunity despite the fact that our court made no such determination in the first appeal.

The parties agreed to the usage of this interrogatory. We acknowledge that the circuit court initially planned to submit the case to the jury on separate interrogatories based on each of the Masterson factors with the court later determining immunity, but the court ultimately acquiesced to the usage of the one interrogatory submitted by the parties.